UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

BRIGHT FALODUN,

                            Petitioner,

          -vs-

MR. JEFF SESSION, Attorney General of
the United States; WALTER M. INGRAM,
Office of Enforcement and Removal
Operations, Post Order Custody Review
Unit Chief, Washington DC Field
Office; MR. THOMAS E. FEELEY, Deputy
Field Office Director Office of
Enforcement and Removal Operations
Buffalo Field Office; SEAN CALLAGHER,
Designated Field Office Director, ERO
Buffalo Federal Detention Facility;
MR. TODD TRYON, Assistant Field
Office Director, Buffalo Federal
Detention Facility; MR. SCHRADER,
Supervisory Detention and Deportation
Officer, Buffalo Federal Detention
Facility; OFFICER J. KLAYBOR,
Deportation Officer Buffalo Federal
Detention Facility,

                            Respondents.

**No. 6:18-cv-06133-MAT**

**DECISION AND ORDER**

## I.    Introduction

Proceeding *pro se*, Bright Falodun ("Falodun" or "Petitioner")
commenced this habeas proceeding on February 12, 2018, pursuant to
28 U.S.C. § 2241 ("§ 2241") against the respondents (hereinafter,
"the Government")[1] challenging his continued detention in the
custody of the United States Department of Homeland Security

---

[1]     Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure,
Attorney General William P. Barr is automatically substituted for the defendant
named as Jeff Session, Attorney General of the United States.

("DHS"), Immigration and Customs Enforcement ("ICE") at the Buffalo Federal Detention Facility ("BFDF"). For the reasons discussed below, the request for a writ of habeas corpus is conditionally granted.

## II.  **Factual Background and Procedural History**

Falodun is a native and citizen of Nigeria, who was paroled into the United States at the New York, New York port of entry on March 10, 1996. On July 26, 1996, his status was adjusted to that of lawful permanent resident ("LPR") under Immigration and Nationality Act ("INA") § 245. He applied for and subsequently was issued a Certificate of Unites States Citizenship on February 17, 1998.

A subsequent criminal investigation resulted in Falodun being charged on December 18, 2001, in a multi-count indictment in the United States District Court for the District of Minnesota. *See United States v. Bright Idada Falodun, et al.*, No. 0:01-cr-00380 (D. Minn.). Following a jury trial, Falodun was convicted on February 14, 2003, of Conspiracy to Commit Bank Fraud, in violation of 18 U.S.C. § 371; Bank Fraud, in violation 18 U.S.C. § 1344; Access Device Fraud, in violation of 18 U.S.C. § 1029(a)(2)(C)(1)(a); Possession of Five or More False Identifications, in violation of 18 U.S.C. §§ 1028(a)(3) and (c)(3); and Possession of Fifteen or More Unauthorized Access Devices, in violation of 18 U.S.C. § 1029(a)(3). Falodun was

sentenced to 175 months' incarceration and ordered to pay restitution in the amount of $1,204,585.00.

On August 20, 2002, the former Immigration and Naturalization Service ("INS") issued a notice of intent to cancel Falodun's Certificate of Citizenship alleging that, based on information gathered in connection with the federal criminal proceeding, Falodun's certificate had been obtained by fraud. According to the INS, Falodun's putative adoptive father was actually his biological brother; his biological father, as of 2002, was alive and living in Nigeria; and Falodun's adoption certificate was fraudulent. In a decision dated April 21, 2003, the INS District Director concluded that the evidence provided by Falodun was insufficient to overcome the evidence supporting cancellation of citizenship. Falodun appealed the decision to the United States Citizenship and Immigration Services ("USCIS") Administrative Appeals Office ("AAO"), which dismissed the appeal on March 29, 2004.

On June 3, 2009, ICE officials encountered Falodun at the Federal Correctional Institution in Allenwood, Pennsylvania. ICE noted that Falodun's projected release date from the Bureau of Prisons ("BOP") was August 10, 2015. He was placed in immigration removal proceedings by a Notice to Appear, dated June 3, 2009, which charged him pursuant to INA § 237(a)(2)(A)(iii), 8 U.S.C. § 1227(a)(2)(A)(iii), as a nonimmigrant having been convicted of an aggravated felony, as defined in INA § 101(a)(43)(M), 8 U.S.C. §

1101(a)(43)(M), a law relating to an offense that (i) involves fraud or deceit in which the loss to the victim or victims exceeds $10,000; or (ii) is described in the Internal Revenue Code of 1986 Section 7201 (relating to tax evasion) in which the revenue loss to the government exceeds $10,000; pursuant to INA § 237(a)(2)(A)(iii), 8 U.S.C. § 1227(a)(2)(A)(iii), as a nonimmigrant having been convicted of an aggravated felony, as defined in INA § 101(a)(43)(U), 8 U.S.C. § 1101(a)(43)(U), a law relating to an attempt or conspiracy to commit an offense described in INA § 101(a)(43), 8 U.S.C. § 1101(a)(43); and pursuant to INA § 237(a)(2)(A)(iii), 8 U.S.C. § 1227(a)(2)(A)(iii), as a nonimmigrant having been convicted of an aggravated felony, as defined in INA § 101(a)(43)(G), 8 U.S.C. § 1101(a)(43)(G), a law relating to a theft offense or burglary offense for which a term of imprisonment of at least one year was imposed.

DHS served the NTA on Falodun on August 27, 2009. Upon completion of his sentence, Falodun was taken into DHS custody on August 10, 2015.

On June 6, 2016, an immigration judge ("IJ") denied Falodun's request to terminate his removal proceedings, rejected his citizenship claim, and ordered him removed from the United States to Nigeria. Falodun appealed the IJ's decision to Board of Immigration Appeals ("BIA") on June 30, 2016. On June 2, 2017, the BIA dismissed Falodun's appeal in a new precedent decision. *Matter*

*of Falodun*, 27 I. & N. Dec. 52 (BIA 2017). The BIA held that "the provisions relating to the revocation of naturalization under [INA] section 340, including the cancellation of the Certificate of Naturalization under [INA] section 340(f), do not apply to persons, like [Falodun], who have obtained citizenship status derivatively and whose Certificate of Citizenship was cancelled under [INA] section 342 of the Act." 27 I. & N. Dec. at 52. The BIA reasoned that notwithstanding the Attorney General's previous recognition of Falodun's derivative citizenship, that official had the authority to declare that Falodun was never a citizen. *See id.* (finding "no support for" the argument that the IJ "was required to defer to a Federal court for a decision on his claim to United States citizenship").

A warrant of removal/deportation was issued for Falodun's removal on June 2, 2017. DHS sought to enforce the removal order against Falodun by requesting travel documents from the Nigerian consulate on or about June 8, 2017.

Previously, on June 6, 2017, Falodun had filed a petition for review ("PFR") with the United States Court of Appeals for the Second Circuit. *Falodun v. Barr*, 17-1813 (2d Cir. June 6, 2017). DHS halted its efforts to remove Falodun pursuant to the forbearance agreement between DHS and the Second Circuit. *See In re Immigration Petitions for Review Pending in U.S. Court of Appeals for Second Circuit*, 702 F.3d 160, 162 (2d Cir. 2012) ("While a

petition [for review] is pending in this Court, the Government's forbearance policy has assured that removal will not occur.").

On June 11, 2017, Falodun officially filed a motion for a stay of removal with the Second Circuit. In an order dated January 18, 2018, the Second Circuit did not directly rule on Falodun's motion for a stay, noting that the forbearance policy remained in effect because the Government did not oppose a stay of removal. Falodun's PFR remains pending before the Second Circuit. Oral argument was held October 7, 2019.[2]

On February 8, 2018, Falodun filed the instant Petition ("Pet.") (ECF #1). Falodun's Petition asserts three grounds for habeas relief. First, he claims that his prolonged detention contravenes 8 U.S.C. § 1231(a)(6) as interpreted by the Supreme Court in *Zadvydas v. Davis*, 533 U.S. 678 (2001). *See* Pet. (ECF #1) ¶¶ 22-23 (Count One). Second, he argues that his continued detention violates his right to substantive due process under the Fifth Amendment, as interpreted by the Supreme Court in *Zadvydas*, because he is not significantly likely to be removed in the reasonably foreseeable future. *See* Pet. ¶¶ 24-27 (Count Two). Third, he argues that in light of his prolonged detention, the denial of a timely and meaningful opportunity to demonstrate that he should not be detained violates his right to procedural due

_____

[2]     Falodun currently has assigned counsel in connection with the PFR.

process under the Fifth Amendment. *See* Pet. ¶¶ 28-29 (Count Three).

The Government filed an Answer and Return and Memorandum of Law in Opposition to the Petition ("Resp. Opp. Mem.") (ECF #5). Falodun filed a Reply on April 18, 2018 (ECF #6). He subsequently submitted a pleading consisting of a letter-brief and medical records (ECF #8) concerning treatment he received at Buffalo General Medical Center in March 2019, for rhabdomyolysis, possibly secondary to his contracting a viral illness and the medication risperidone, which he takes for depression and schizophrenia; acute kidney injury/acute tubular necrosis, secondary to rhabdomyolosis; hyperkalemia; metabolic acidosis; and transaminitis. Falodun was discharged back to the BFDF after a 10-day hospital stay.

The Petition was transferred to the undersigned on July 31, 2019 (ECF #9).

Finding a discrepancy in the Government's memorandum of law as to which statute—8 U.S.C. § 1231 ("§ 1231") or 8 U.S.C. § 1226 ("§ 1226")—authorized Falodun's detention, the Court requested further briefing from the Government to clarify its position on the statutory basis for detention in this case. The Government submitted a Supplemental Brief ("Resp. Supp.") (ECF #14) asserting that § 1231 authorizes Falodun's detention. Joseph Moravec, Esq., an attorney representing Falodun in connection with his removal proceedings, filed a Supplemental Brief in Support of the Petition

("Petr. Supp.") (ECF #15), arguing that § 1226 provides the statutory basis for his detention. The New York Civil Liberties Union ("NYCLU") sought (ECF #17) and received permission to file an *amicus* brief (ECF #22) in support of Falodun's Petition.

## III.  Scope of Review

Title 28 U.S.C. § 2241 grants this Court jurisdiction to hear habeas corpus petitions from aliens claiming they are held "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3); *Zadvydas v. Davis*, 533 U.S. 678, 687 (2001) (citing 28 U.S.C. § 2241(c)(3)). However, the REAL ID Act of 2005, Pub. L. No. 109-13, § 106(a), 199 Stat. 231 (May 11, 2005) amended the Immigration and Nationality Act ("INA") to provide that petitions for review filed in the appropriate Courts of Appeals were to be the "sole and exclusive means for judicial review" of final orders of removal. *Ruiz-Martinez v. Mukasey*, 516 F.3d 102, 113 (2d Cir. 2008) (citing REAL ID Act § 106(c); 8 U.S.C. § 1252(a)(5)). In other words, the REAL ID Act "strips district courts of jurisdiction to hear habeas petitions challenging final orders of deportation. . . ." *De Ping Wang v. Dep't of Homeland Sec.*, 484 F.3d 615, 615-16 (2d Cir. 2007). District courts still are empowered to grant relief under § 2241 to claims by aliens in removal proceedings that their detention and supervision are unconstitutional. *See Zadvydas*, 533 U.S. at 687-88; *see also Hernandez v. Gonzales*, 424 F.3d 42, 42–43 (1st Cir. 2005) ("The

-8-

Real ID Act deprives the district courts of habeas jurisdiction to review orders of removal, . . . [but] those provisions were not intended to 'preclude habeas review over challenges to detention that are independent of challenges to removal orders.'") (quoting H.R. Cong. Rep. No. 109-72, at *43 2873 (May 3, 2005)).

Although this Court has jurisdiction to decide statutory and constitutional challenges to civil immigration detention, it does not have jurisdiction to review the discretionary decisions of the Attorney General. *Zadvydas*, 533 U.S. at 688 (citing 8 U.S.C. § 1252(a)(2)(B)(ii)) ("[N]o court shall have jurisdiction to review . . . any other decision or action of the Attorney General . . . the authority of which is specified under this subchapter to be in the discretion of the Attorney General."). "[W]hether the district court has jurisdiction will turn on the substance of the relief that a [petitioner] is seeking." *Delgado v. Quarantillo*, 643 F.3d 52, 55 (2d Cir. 2011) (*per curiam*).

## IV. Discussion

### A. Statutory Basis for Petitioner's Detention

The Court first considers the statutory basis for Falodun's detention. *See Prieto-Romero v. Clark*, 534 F.3d 1053, 1057 (9th Cir. 2008) (noting that to determine whether detention of an alien is authorized, threshold question is where to "locate [him or her] . . . within the complex statutory framework of detention authority

provided by Sections 236 and 241 of the Immigration and Nationality Act, codified at 8 U.S.C. §§ 1226 and 1231").

"The distinction between § 1226 and § 1231 essentially comes down to whether an alien is subject to a final order of removal." *Enoh v. Sessions*, 236 F. Supp.3d 787, 793 (W.D.N.Y. 2017), *appeal withdrawn*, No. 17-1236, 2017 WL 6947858 (2d Cir. Dec. 7, 2017). Title 8 U.S.C., § 1231(a)(1)(A) provides for a 90-day removal period, during which the Government "shall detain," *id.* § 1231(a)(2), an alien "ordered removed," *id.* § 1231(a)(1)(A).

The statute specifies that the removal period begins on the *latest* of the following events:

> (i) The date the order of removal becomes administratively final.
>
> (ii) If the removal order is judicially reviewed and if a court orders a stay of the removal of the alien, the date of the court's final order.
>
> (iii) If the alien is detained or confined (except under an immigration process), the date the alien is released from detention or confinement.

8 U.S.C. § 1231(a)(1)(B).

After the 90-day period of mandatory detention, the Government has the discretion to release the alien or continue to detain him or her. *See* 8 U.S.C. § 1231(a)(6) (stating that an alien ordered removed "may be detained beyond the removal period").

The parties dispute whether § 1226 or § 1231 authorizes the detention of immigrants, such as Falodun, whose removal has been

stayed by operation of the forbearance policy[3] between the Second Circuit and the Government rather than as the result of a judicially ordered stay. The Government has clarified that it believes § 1231 governs Falodun's detention. Petitioner, in his original *pro se* petition, asserted that he was detained under § 1231. However, upon consultation with his immigration attorney, he now contends that he is detained under § 1226. Likewise, *amicus* NYCLU asserts that § 1226 applies to Falodun. Both Falodun and *amicus* rely on the Second Circuit's decision in *Hechavarria v. Sessions*, 891 F.3d (2d Cir. 2018). In any event, Falodun and *amicus* argue, even assuming he is detained under § 1231, his detention has become so unreasonably prolonged that he is entitled to a bond hearing. As discussed further below, the Court agrees with Petitioner and *amicus* that § 1226 governs his detention. Therefore, the Court need not reach their alternative argument regarding § 1231.

### 1. The Reasoning of *Hechavarria* Compels the Conclusion that § 1231 Does Not Apply to Petitioner's Detention

---

[3] Where, as here, the Government does not oppose the immigrant's stay motion, he or she remains subject to the forbearance policy while the PFR is pending before the Circuit. *See* Letter from Hon. Jon O. Newman, U.S. Court of Appeals for the Second Circuit, to David McConnell, Deputy Dir., Office of Immigration Litig. (Mar. 16, 2009) ("Newman Letter") at 2, attached as Ex. C to Roeck Decl. (ECF #22-1). The forbearance policy's practical effect is to obviate the need for the Circuit to analyze and adjudicate stay motions when the stay request is unopposed. Petr. Supp. (ECF #15) at 10. "Under the agreement, unless DHS provides notice otherwise, removal will not be effectuated against a petitioner until a stay is adjudicated." *Id.* (citing *In re Immigration Petitions*, 702 F.3d at 162 ("In the event that the Court and a petitioner are advised at any time that this assumption [that removal is stayed] is unwarranted, the petitioner may promptly apply for a stay of removal.")).

In *Hechavarria*, the petitioner's PFR was "pending judicial review," 8 U.S.C. § 1231(a)(1)(B)(ii), by the Second Circuit, which had ruled on his motion for a stay of removal. Thus, there was a "court order[ed] a stay of the removal[,]" *id.* However, there was no "final order," *id.*, by the Second Circuit on his PFR. Based on a plain-text reading of 8 U.S.C. § 1231(a)(1)(B)(ii), the Second Circuit observed, the removal period as defined in 8 U.S.C. § 1231(a)(1)(B) had not begun for Hechavarria. 891 F.3d at 55. Because Section 1231 governs detention only *during* or *after* the removal period, it could not apply to Hechavarria's circumstances. *See id.* ("The unambiguous language of the statute makes plain that Hechavarria cannot be detained pursuant to Section 1231.").

The Circuit rejected the Government's "attempt[ ] to skirt this clear statutory language by arguing that [it] need only determine when Hechavarria's order became administratively final." *Hechavarria*, 891 F.3d at 55. To do so would require the Circuit "to ignore section (ii)'s clear language 'on the latest of the following,' so that any immigrant with an administratively final order of removal is subject to detention under 8 U.S.C. § 1231." *Id.* However, the Circuit found, such a reading was "untenable" because it would "render subsection (ii) mere surplus." *Id.*

As further reinforcement of its plain-text reading of § 1231, the Second Circuit pointed to the "structure and logic" of the statute, which "addresses the logistics of removal," "assumes that

the immigrant's removal is both imminent and certain," and defines the removal period in a manner "dependent upon the assumption that no substantive impediments remain to the immigrant's removal." *Hechavarria*, 891 F.3d at 55. Given that a judicial stay of removal is a "substantive impediment" to deportation, the Circuit reasoned, "it would make no sense to classify Hechavarria in the same section of the statute that governs the removal of aliens who have no remaining barriers preventing their immediate removal." *Id.* at 57.

Falodun's case is in the same procedural posture as that of the petitioner in *Hechavarria* except that the Second Circuit has not ruled on Falodun's stay motion, meaning that it has not "order[ed] a stay of the removal[,]" 8 U.S.C. § 1231(a)(1)(B)(ii). Nonetheless, just as in *Hechavarria*, there is a "substantive impediment to [Falodun's] deportation," 891 F.3d at 55, in the form of the forbearance policy. *See* Tolling Order, *Falodun v. Barr*, 17-1813 (2d. Cir. July 14, 2017). As Falodun points out, the Government did not oppose Falodun's request for a stay, and "thus the forbearance policy acts as a *de facto* stay of removal." Petr. Supp. (ECF #15) at 3 (citing ECF #45 in *Falodun v. Barr*, 17-1813, Motion Order (2d Cir. Jan. 8, 2018) ("The forbearance policy remains in effect because Respondent does not oppose a stay of removal.")).

The Government urges that *Hechavarria* is not controlling here since the Second Circuit did not address the scenario presented by

this case—that is, where the forbearance policy—and not a judicially-ordered stay—is preventing the alien's removal. *See Hechavarria*, 891 F.3d at 54 n.3 ("Because we review Hechavarria's habeas petition after this Court has issued a stay of removal in his underlying petition for review, we need not decide the contours of judicial review during detention pursuant to the government's forbearance policy in this Circuit."). However, "the overwhelming majority of courts in this Circuit have found that the forbearance agreement amounts to a 'court ordered stay of the removal of the alien' and that detainees with a pending petition for review are detained pursuant to [8 U.S.C.] § 1226." *Ranchinskiy v. Barr*, No. 19-CV-6348-EAW, ECF #8, Nov. 8, 2019 Order at 11 (W.D.N.Y. Nov. 8, 2019) (Wolford, D.J.) (citing *Sankara v. Whitaker*, No. 18-CV-1066, 2019 WL 266462, at *4 (W.D.N.Y. Jan. 18, 2019) (Vilardo, D.J.)). Although in some forbearance policy cases, district courts within and without this Circuit had determined that Section 1231 governed the alien's detention, "almost none have so held in the wake of the Second Circuit's decision in *Hechavarria*[.]" *Ranchinskiy*, Nov. 8, 2019 Order at 12; *but see Nunez v. Searls*, No. 18-CV-6463-CJS, 2019 WL 2524308 (W.D.N.Y. June 19, 2019), *appeal docketed sub nom. Nunez v. Whaling*, 19-2114 (2d Cir. July 10, 2019). In *Nunez*, however, both the petitioner and the Government argued that 8 U.S.C. § 1231 governed detention, and the district court never considered *Hechavarria*. In these respects, *Nunez* is distinguishable from the

present case and is, in any event, not binding precedential authority.

### 2. Applying § 1231 to Aliens Detained Under Forbearance Stays But Not Judicially Ordered Stays Would Lead to Incongruous Results

Ordinarily, "[a] statute should be interpreted in a way that avoids absurd results." *United States v. Dauray*, 215 F.3d 257, 264 (2d Cir. 2000) (citation omitted); *see also Viacom Int'l, Inc. v. FCC*, 672 F.2d 1034, 1039 (2d Cir. 1982) ("[T]he surest way to misinterpret a statute or a rule is to follow its literal language without reference to its purpose.") (citation omitted). The Government urges a strict construction of § 1231(b)(1)(B)(ii)'s phrase, "court orders," to require that the Circuit actually grant the motion for a stay. But this would lead to anomalous results in practice.

It is evident that, practically speaking, a judicially-ordered stay of removal and the forbearance policy are indistinguishable. Petr. Supp. at 14 (ECF #15). Both mean that the Government is prevented from removing the alien as long as the PFR remains pending before the Circuit. *See In re Immigration Petitions*, 702 F.3d at 162 ("In the event that the Court and a petitioner are advised at any time that this assumption [that removal is stayed as a result of the forbearance policy] is unwarranted, the petitioner may promptly apply for a stay of removal.").

Distinguishing between a court-ordered stay and the *de facto* stay that results from the forbearance policy would require the Court to treat two petitioners in exactly the same procedural posture differently. Falodun offers the following hypothetical to illustrate this point. *See* Petr. Supp. (ECF #15) at 14-15. Two detained aliens have administratively-final orders of removal. One moves for a stay of removal, the Government opposes the motion, and the Circuit grants the motion and orders a stay. Under the Government's theory, this alien's detention is authorized under § 1226(c), not § 1231(b)(1)(B)(ii). The other alien moves for a stay of removal, the Government does not oppose the motion, and everyone proceeds under the assumption that the forbearance policy prevents the alien's removal during the pendency of the Circuit proceeding. According to the Government, this alien's detention is governed by § 1231(b)(1)(B)(ii). However, the only difference between these two individuals is an external factor beyond their control—the litigation strategy the Government followed in their respective cases.

Because adopting the Government's interpretation would "tend[ ] to produce absurd results," *Dauray*, 215 F.3d at 264, the Court declines to adopt it. Instead, the Court finds that the Second Circuit's reasoning in *Hechavarria* with regard to the "structure and logic" of the detention statutes applies with equal force to petitioners whose removal is prevented by operation of the

forbearance policy. "Because the combined effect of [Falodun's] Second Circuit proceeding and the forbearance agreement creates a 'substantive impediment' to his removal, . . . this Court concludes that . . . the forbearance agreement amounts to a 'court order[ed] stay of the removal of the alien.'" *Sankara v. Whitaker*, No. 18-CV-1066, 2019 WL 266462, at *4 (W.D.N.Y. Jan. 18, 2019) (quoting *Hechavarria*, 891 F.3d at 55; citing *Argueta Anariba v. Shanahan*, 190 F. Supp.3d 344, 349 (S.D.N.Y. 2016); alterations in original; footnote and other citations omitted).

### 3. Section 1226 Governs Petitioner's Detention

In *Hechavarria*, after finding that § 1231 could not authorize the petitioner's detention, the Second Circuit considered the applicability of § 1226. *Hechavarria*, 891 F.3d at 57. The Circuit rejected the Government's argument that this statute only applies to aliens without administratively final removal orders. Interpreting § 1226 to apply broadly to "immigrants who are not immediately deportable[,]" *id.*, the panel reasoned that individuals who have judicially-ordered stays likewise are not immediately deportable and thus are detained pursuant to § 1226. *Id.* Accordingly, the Second Circuit determined, Hechavarria was detained pursuant to § 1226(c).

Here, having found that the combined effect of Falodun's PFR pending before the Second Circuit and the forbearance agreement creates a "substantive impediment to his removal," the Court

concludes that he is not "immediately deportable," *id.*, and thus §
1226(c) governs his detention. *E.g.*, *Hemans v. Searls*, No.
18-CV-1154, 2019 WL 955353, at *3 (W.D.N.Y. Feb. 27, 2019) (where
alien had filed PFR in Second Circuit, and forbearance agreement
was in effect, alien's removal period had not begun, and he
remained detained under § 1226 rather than § 1231).

While § 1226(c) is facially constitutional and authorizes
Falodun's detention as a statutory matter, *see Jennings v.
Rodriguez*, 138 S. Ct. 830, 846 (2018), his "continuing detention
must also be consistent with substantive and procedural due process
principles as they are applied to him." *Joseph v. Decker*, No.
18-CV-2640(RA), 2018 WL 6075067, at *9 (S.D.N.Y. Nov. 21, 2018),
*appeal withdrawn*, No. 19-245, 2019 WL 3334802 (2d Cir. May 1, 2019)
(citing *Martinez v. Decker*, No. 18-CV-6527 (JMF), 2018 WL 5023946,
at *4 (S.D.N.Y. Oct. 17, 2018)). In *Jennings*, the Supreme Court
"explicitly left open the question of what constitutional
procedural protections are required." *Martinez*, 2018 WL 5023946, at
*4 (citing *Jennings*, 138 S. Ct. at 851 (remanding the class
members' constitutional claims for consideration, in the first
instance, by the lower courts); *see also Hechavarria v. Sessions*,
No. 15-CV-1058, 2018 WL 5776421, at *2 (W.D.N.Y. Nov. 2, 2018)
(noting that *Jennings* "left open the constitutional questions
raised by prolonged mandatory detention under § 1226(c)") (citing

-18-

138 S. Ct. at 851), *enforcement granted sub nom. Hechavarria v. Whitaker*, 358 F. Supp.3d 227 (W.D.N.Y. 2019).

**B.   Petitioner's Continued Detention Under § 1226(c) Has Become Unreasonably Prolonged and Violates Procedural Due Process**

In Count Three of the Petition, Falodun asserts that under the Due Process Clause of the Fifth Amendment, "an alien is entitled to a timely and meaningful opportunity to demonstrate that s/he should not be detained[,]" but in this case, he has been denied that opportunity because "ICE does not make decisions concerning alien's custody status in a neutral and impartial manner." Pet. ¶ 29. He asserts that the Government's failure "to provide a neutral decisionmaker to review [his] continued custody . . . violates [his] right to procedural due process." *Id.*

**1.   General Legal Principles**

The Fifth Amendment's Due Process Clause forbids depriving any "person . . . of . . . liberty . . . without due process of law[.]" U.S. CONST. amend. V. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." *Zadvydas*, 533 U.S. at 690 (citing *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992)). "Aliens, even aliens whose presence in this country is unlawful, have long been recognized as 'persons' guaranteed due process of law by the Fifth and Fourteenth Amendments." *Plyer v. Doe*, 457 U.S. 202, 210 (1982) (citations omitted).

The Supreme Court "has held that the Due Process Clause protects individuals against two types of government action." *United States v. Salerno*, 481 U.S. 739, 746 (1987). "So called 'substantive due process' prevents the government from engaging in conduct that 'shocks the conscience,' . . . or interferes with rights 'implicit in the concept of ordered liberty.'" *Salerno*, 481 U.S. at 746 (internal and other quotations omitted). "When government action depriving a person of life, liberty, or property survives substantive due process scrutiny, it must still be implemented in a fair manner." *Id.* (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). "This requirement has traditionally been referred to as 'procedural' due process." *Id.*

### 2. Application of the *Mathews* Test

Falodun argues that under the three-part balancing test articulated in *Mathews*, *supra*, procedural due process requires that he be afforded a bond hearing before a neutral arbiter at which the Government bears the burden of proving he should not be released. *See* Petr. Supp. (ECF #15) at 16-22; *see also Hechavarria*, 2018 WL 5776421, at *7-*9 (relying on the *Mathews* test to find a violation of procedural process where the § 1226(c) detainee had not received a bond hearing in the five years he had been detained). "[I]dentification of the specific dictates of due process generally requires consideration of three distinct factors," *Mathews*, 424 U.S. at 335, namely, "the private interest affected;" "the risk of

erroneous deprivation of that interest through the procedures used;" and "the governmental interest at stake." *Nelson v. Colorado*, 137 S. Ct. 1249, 1255 (2017) (citing *Mathews*, 424 U.S. at 335).

### a.    The Nature of Petitioner's Interest

Under *Mathews*, then, the Court must begin with a description of the right asserted by Falodun. *See Harper*, 494 U.S. at 220 ("It is axiomatic that procedural protections must be examined in terms of the substantive rights at stake."). It is well established "[f]reedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action," and courts have taken great care "not to 'minimize the importance and fundamental nature' of the individual's right to liberty." *Foucha*, 504 U.S. at 80 (citations omitted); *accord, e.g., Zadvydas v. Davis*, 533 U.S. 678, 690 (2001).

It is equally well established that "the Fifth Amendment entitles aliens to due process of law in deportation proceedings." *Demore v. Kim*, 538 U.S. 510, 523 (2003) (citation omitted). Nevertheless, Congress has plenary power over substantive immigration matters and may "make rules as to aliens that would be unacceptable if applied to citizens." *Demore*, 538 U.S. at 522 (citation omitted). The Supreme Court has recognized that power has its limits. For example, in *Zadvydas*, the Supreme Court observed

that when civil detention of aliens "no longer 'bear[s] [a] reasonable relation," 533 U.S. at 690 (quotation omitted), to the Government's asserted purposes for such detention—ensuring attendance at immigration proceedings and preventing danger to the community—due process would be offended. *See id.* (citing *Jackson v. Indiana*, 406 U.S. 715, 738 (1972) ("At the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed.")). Likewise, in his concurring opinion in *Demore*, Justice Kennedy observed that "[s]ince the Due Process Clause prohibits arbitrary deprivations of liberty, a lawful permanent resident alien such as respondent could be entitled to an individualized determination as to his risk of flight and dangerousness if the continued detention became unreasonable or unjustified." *Demore*, 538 U.S. at 532 (concurring opn., Kennedy, J.) (citing *Zadvydas*, 533 U.S. at 684-86 (dissenting opn., Kennedy, J.) ("[A]liens are entitled to be free from detention that is arbitrary or capricious.")). Courts in this Circuit have overwhelmingly read *Zadvydas* and *Demore* to stand for the proposition that an alien "is entitled to adequate procedural safeguards to protect his right to be free from arbitrary or 'unreasonable' civil detention." *Joseph*, 2018 WL 6075067, at *10 (citing *Sajous v. Decker*, No. 18-CV-2447 (AJN), 2018 WL 2357266, at *10 (S.D.N.Y. May 23, 2018)).

**b.    Petitioner's Detention Has Become Unreasonably Prolonged**

In the wake of *Jennings*' rejection of a six-month bright-line rule for determining when an alien is entitled to heightened due process protections, a number of courts have "examine[d] each individual's detention circumstance to determine whether it has become 'unreasonable or unjustified.'" *Cabral v. Decker*, 331 F. Supp. 3d 255, 261 (S.D.N.Y. 2018) (quoting *Demore*, 538 U.S. at 532 (concurring opn., Kennedy, J.); *see also Hemans v. Searls*, No. 18-CV-1154, 2019 WL 955353, at *6 (W.D.N.Y. Feb. 27, 2019). *Amicus* NYCLU maintains that the length of confinement alone triggers enhanced due process protections but argues that Falodun still would be entitled to a bond hearing under a multi-factor test for assessing when detention in the absence of a bond hearing has become unreasonably prolonged so as to violate procedural due process. *See* Brief of *Amicus Curiae* New York Civil Liberties Union in Support of the Petition ("*Amicus* Br.") (ECF #22) at 12 n.6 (citing *Sajous*, 2018 WL 2357266, at *10–11 (considering (1) the length of time the alien has been detained; (2) whether the alien is responsible for the delay; (3) whether the alien has asserted defenses to removal; (4) whether the alien's civil immigration detention exceeds the time the alien spent in prison for the crime that rendered him removable; and (5) whether the facility for the civil immigration detention is meaningfully different from a penal

institution for criminal detention)). *See also*, *e.g.*, *Hemans*, 2019 WL 955353, at *6 ("Factors bearing on this question include (1) the total length of detention to date; (2) the conditions of detention; (3) delays in the removal proceedings caused by the parties; and (4) the likelihood that the removal proceedings will result in a final order of removal.") (citing *Jamal A. v. Whitaker*, 358 F. Supp.3d 853, 859-60 (D. Minn. 2019); footnote omitted).

"First, and most important, courts consider the length of detention." *Hemans*, 2019 WL 955353, at *6; *see also*, *e.g.*, *Muse v. Sessions*, No. 18-CV-0054(PJS/LIB), 2018 WL 4466052, at *4 (D. Minn. Sept. 18, 2018) ("How long th[e] deprivation [of liberty] has lasted is critical to the due-process inquiry."). As an initial matter, the Court notes that the passage of the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA") in 1996, Pub. L. 104-208, §§ 326, 329, 110 Stat. 3009-630 to 3009-631 (codified at 8 U.S.C. § 1228), "significantly expanded the categories of non-citizens subject to mandatory detention pending their removal proceedings." *Lora v. Shanahan*, 804 F.3d 601, 604 (2d Cir. 2015), *cert. granted, judgment vacated on other grounds*, 138 S. Ct. 1260 (2018). Under § 236 of the revised INA, DHS is required to detain aliens who have committed certain crimes "when [they are] released." 8 U.S.C. § 1226(c). Section 1226(c) contains no explicit provision for the possibility of a bond hearing. *Lora*, 804 F.3d at 604.

When the constitutionality of § 1226(c) was challenged in *Demore*, 538 U.S. 510, *supra*, the statistics submitted by the Government to the Supreme Court indicated that "the detention at stake under § 1226(c) lasts roughly a month and a half in the vast majority of cases in which it is invoked, and about five months in the minority of cases in which the alien chooses to appeal." *Id.* at 530 (footnote omitted). The alien in *Demore* was detained for six months, "somewhat longer than the average," but, the Supreme Court observed, he "had requested a continuance of his removal hearing." *Id.* at 530-31. "Emphasizing the relative brevity of detention in most cases," *Lora*, 804 F.3d at 604,[4] the Supreme Court concluded that mandatory detention during removal proceedings was "constitutionally permissible." *Demore*, 538 U.S. at 531.

Here, Falodun was taken into DHS custody on August 10, 2015. As of December 1, 2019, he has been detained 51 months and 22 days—more than tenfold the average length of mandatory detention for aliens who appealed their removal orders in 2003, when *Demore*

---

[4]     As the district court in *Sajous*, 2018 WL 2357266, at *18, pointed out, the majority opinion in *Demore* referenced the term "brief," or referred to the relatively short length of detention at issue, several times. *See* 538 U.S. at 513 ("We hold that Congress, justifiably concerned that deportable criminal aliens who are not detained continue to engage in crime and fail to appear for their removal hearings in large numbers, may require that persons such as respondent be detained for the *brief* period necessary for their removal proceedings.") (emphasis supplied); *id.* at 523 (characterizing respondent's argument as follows: "the Government may not, consistent with the Due Process Clause of the Fifth Amendment, detain him for the *brief* period necessary for his removal proceedings.") (emphasis supplied); *id.* at 522-23 ("*Zadvydas* is materially different . . . [because] [w]hile the period of detention at issue in *Zadvydas* was 'indefinite' and 'potentially permanent,' the detention here is of a *much shorter duration*.") (internal quotation omitted; emphasis supplied).

was decided. By either an absolute or relative standard, this is significant length of time.

The Government contends that detention under Section 1226(c) without a hearing, regardless of its length, survives due process scrutiny whenever the alien elects to challenge his or her removal order and request a stay of removal. This argument goes to the factor that considers which side is responsible for any delay in the removal proceedings. While "a close reading of *Demore* suggests that the government may reasonably detain an immigrant under § 1226(c) without a hearing for a somewhat longer period if the immigrant chooses to appeal[,]" *Hechavarria*, 2018 WL 5776421, at *7 (citing *Demore*, 538 U.S. at 529 (differentiating between average lengths of detention among detainees who have appealed decisions to the BIA and those who have not); other citation omitted)), Falodun's four-year-plus detention far exceeds the five-month average period considered "average" in *Demore* for those detainees who appealed their removal orders.

The Court is not persuaded by the Government's assertion that Falodun "cannot press a due process challenge when detention is extended due to [his] continued pursuit of legal challenges." Resp. Supp. (ECF #14) at 5; *see also* Resp. Opp. Mem. (ECF #5) at 9 ("Aliens can immediately end detention at any time by accepting a final order of removal[.]")). The Second Circuit has indicated that this factor weighs against an immigrant who has "'substantially

prolonged his stay by abusing the processes provided to him,'" but not "an immigrant who simply made use of the statutorily permitted appeals process." *Hechavarria*, 891 F.3d at 56 n.6 (quoting *Nken v. Holder*, 556 U.S. 418, 436 (2009)). Indeed, "appeals and petitions for relief are to be expected as a natural part of the process. An alien who would not normally be subject to indefinite detention cannot be so detained merely because he seeks to explore avenues of relief that the law makes available to him." *Ly v. Hansen*, 351 F.3d 263, 272 (6th Cir. 2003); *see also Guerrero-Sanchez v. Warden York Co. Prison*, 905 F.3d 208, 220 (3d Cir. 2018) ("detaining Guerrero-Sanchez without a bond hearing while he pursues his *bona fide* withholding-only claim would effectively punish him for pursuing applicable legal remedies") (internal quotation omitted). There is no indication in the record that Falodun has "filed frivolous appeals in order to delay [his] deportation," *Demore*, 538 U.S. at 530 n.14, or has otherwise "substantially prolonged his stay by abusing the processes provided to him," *Hechavarria*, 891 F.3d at 56 n.6 (quotation omitted).[5] Rather, Falodun has "simply made use of the statutorily permitted appeals process." *Id.* The

_____

[5]     In connection with his PFR before the Second Circuit, Falodun's counsel has filed a brief arguing, *inter alia*, that the BIA erred as a matter of law in administratively revoking Falodun's United States citizenship *ab initio* during the same administrative proceeding in which it cancelled Falodun's Certificate of Citizenship. Falodun also argues that the BIA also clearly erred by failing to review whether the INS District Director should have considered certain evidence proffered by Falodun at his cancellation proceeding, including documents and witnesses that tended to support Falodun's motion to terminate his removal proceeding. *See* ECF #94 in *Falodun v. Barr, et al.*, 17-1813 (2d Cir. Oct. 29, 2018).

Court cannot agree that Falodun's detention is reasonable simply because he has sought "to explore avenues of relief that the law makes available to him[,]" *Ly*, 351 F.3d at 272. "[A]lthough an alien may be responsible for seeking relief, he is not responsible for the amount of time that such determinations may take." *Id.* The Court declines to penalize Falodun for the delays occasioned due to his pursuit of a good-faith, colorable legal and factual challenge to the summary cancellation of his citizenship, without a district court proceeding. As Falodun observes, "[c]itizenship in the United States of America is among our most valuable rights." Petr. Supp. (ECF #15) at 27 (quoting *Gorbach v. Reno*, 219 F.3d 1087, 1098 (9th Cir. 2000) (*en banc*)).

With regard to the factor that considers the likelihood of the removal proceedings resulting in a final order of removal or, stated another way, the strength of the alien's defenses to removal, the Government argues that Falodun's removal is imminent because briefing is complete in the Second Circuit and oral argument was held in October. The Government is correct regarding the procedural posture of Falodun's PFR. However, this argument assumes two things, neither of which are certain—that the Circuit will decide the case imminently and in the Government's favor. Petitioner asserts, and the Court has no reason to doubt, that PFRs "often remain pending (even after oral argument) for a significant time, many cases are overturned or remanded, and petitioners often

prevail after judicial review." Petr. Supp. (ECF #15) at 28 (citing *Benslimane v. Gonzales*, 430 F.3d 828, 829-30 (7th Cir. 2005) (Posner, J.) ("In the year ending on the date of the argument, different panels of this court reversed the [BIA] in whole or part in a staggering 40 percent of the 136 petitions to review the Board that were resolved on the merits . . . This tension between judicial and administrative adjudicators is not due to judicial hostility to the nation's immigration policies or to a misconception of the proper standard of judicial review of administrative decisions. *It is due to the fact that the adjudication of these cases at the administrative level has fallen below the minimum standards of legal justice*.") (emphasis supplied; *cited with approval in Ming Shi Xue v. Bd. of Immigration Appeals*, 439 F.3d 111, 114 n.3 (2d Cir. 2006)).

With regard to the factors that address the length of civil detention vis-à-vis any criminal sentence the alien served for the crime that made him removable, Petitioner concedes that his term of incarceration exceeds his time at the BFDF. But, as some district courts have pointed out, "it makes little sense to compare 'different types of custody imposed for different reasons by different sovereigns' to determine whether federal immigration detention has become unreasonably prolonged. *Hemans*, 2019 WL 955353, at *6 n.4 (quoting *Muse*, 2018 WL 4466052, at *3 n.4; citing *Jones v. United States*, 463 U.S. 354, 369 (1983) (holding that

"[t]he length of an acquittee's hypothetical criminal sentence . . . is irrelevant to the purposes of his commitment")).

Finally, the Court recognizes that Falodun is not being held in an penal institution. A "civil label is not always dispositive." *Allen v. Illinois*, 478 U.S. 364, 369 (1986), and courts have observed that "merely calling a confinement 'civil detention' does not, of itself, meaningfully differentiate it from penal measures." *Chavez-Alvarez v. Warden York Cty. Prison*, 783 F.3d 469, 478 (3d Cir. 2015) (citations omitted). Even assuming, however, that conditions at the BFDF "meaningfully differentiate" it from a correctional facility, the significant length of Falodun's detention outweighs this factor. It bears emphasizing that regardless of the descriptor used, the right infringed upon is the same—freedom from bodily restraint, which "always has been recognized as the core of the liberty protected by the Due Process Clause from arbitrary governmental action.'" *Youngberg v. Romeo*, 457 U.S. 307, 316 (1982) (quoting *Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 18 (1979) (concurring and dissenting opn., Powell, J.)).

### c.   The Process Received to Date

Before proceeding to evaluate the nature of the process due to Falodun, the Court takes notice of the process Falodun has received to date. Because he initially was detained under § 1226(c), he

received what is known as a *Joseph* hearing.[6] The initial burden is on the Government to establish that there is "reason to believe" that the detained alien is deportable or inadmissible under a ground listed in 8 U.S.C. § 1226(c)(1)(A)-(D). The alien may only avoid mandatory detention by demonstrating that "he is not an alien, was not convicted of the predicate crime, or that [DHS/ICE] is otherwise substantially unlikely to establish that he is in fact subject to mandatory detention." *Demore*, 538 U.S. at 514 n.3. At a *Joseph* hearing, the sole question is whether the alien is an "alien described" in § 1226(c); there is no inquiry into the Government's putative regulatory interests in detention, such as risk of flight or dangerousness. Thus, the Court finds, a *Joseph* hearing cannot be seen as an adequate procedural substitute for a bond hearing. *See Hechavarria*, 2018 WL 5776421, at *8 ("[A]t a *Joseph* hearing, the § 1226(c) detainee has the burden of proving that he should not be a § 1226(c) detainee, and the government's regulatory purposes in detention itself—for example risk of flight or dangerousness—are irrelevant.").

The Government indicates that Falodun has received sufficient procedural protections in the form of periodic custody reviews by ICE officials pursuant to the regulations set forth at 8 C.F.R. § 241.4. The eight Decisions to Continue Custody issued by ICE

_____

[6]     The hearing is so-named after *Matter of Joseph*, 22 I. & N. Dec. 799, 1999 WL 339053 (BIA 1999), and it is now codified at 8 CFR § 1003.19(h)(2)(ii), which characterizes it as a "custody redetermination hearing."

consist of the same form letter, newly signed by the same ICE official every few months. The form letter essentially restates the factual and procedural history of Falodun's immigration proceedings but offers no explanation or rationale for ICE's decision to continue Falodun's detention. *See* Decisions to Continue Detention (ECF #13-1), Ex. 1 to Declaration of Deportation Officer Silvestre Talavera ("Talavera Decl.") (ECF #13). These *pro forma* custody reviews are not even in compliance with the applicable regulations, which provide that "[a] decision to retain custody *shall briefly set forth the reasons* for the continued detention." 8 C.F.R. § 241.4(d) (emphasis supplied). Even assuming that ICE had articulated the reasons for continuing to detain Falodun, the Court cannot agree that these cursory, unreviewable custody determinations are constitutionally adequate given the protected liberty interest at stake and the length of his detention to date.

### d. The Government's Interest and the Risk of an Erroneous Deprivation with the Process Used

The Court is not suggesting that the Government lacks any legitimate interest in detaining Falodun. Curiously, however, the Government suggests that it need not do so. Indeed, even in his dissenting opinion in *Zadvydas*, Justice Kennedy recognized that "both removable and inadmissible aliens are entitled to be free from detention that is arbitrary or capricious." *Zadvydas*, 533 U.S. at 721 (dissenting opn., Kennedy, J.). The Government instead

relies on § 1226(c)'s language mandating the detention of certain categories of aliens during their removal proceedings. While the Supreme Court has held that, as a matter of statutory interpretation, § 1226(c) does not contain any temporal limit on detention, "*Jennings* explicitly left open the question of what *constitutional* procedural protections are required[,]" *Martinez*, 2018 WL 5023946, at *4 (emphasis supplied). Thus, contrary to the Government's suggestion, the statutory language of § 1226(c) does not end the Court's inquiry on habeas review.

This brings the Court back to three fundamental principles. First, freedom from bodily restraint is protected by the Fifth Amendment's Due Process Clause. Second, the Due Process Clause protects citizens and non-citizens alike. Third, detention under the immigration statutes is "civil, not criminal, and [the Supreme Court has] assume[d] that they are nonpunitive in purpose and effect." *Zadvydas*, 533 U.S. at 690. Here, however, the Government has not articulated what purposes Falodun's detention is serving. In the civil detention context, the Supreme Court has observed that "where detention's goal is no longer practically attainable, detention no longer 'bear[s][a] reasonable relation to the purpose for which the individual [was] committed.'" *Zadvydas*, 533 U.S. at 690 (quoting *Jackson*, 406 U.S. at 718; alterations in original). A bond hearing is thus necessary to assess whether the Government has interests in continuing to detain Falodun that are "legitimate and

compelling[,]" *Salerno*, 481 U.S. at 752, or whether his "detention no longer bear[s][a] reasonable relation to [its] purpose[,]" *Zadvydas*, 599 U.S. at 690 (quotation omitted; first two alterations in original); *see*, *e.g.*, *Hechavarria*, 2018 WL 5776421 at *8 ("[The government] contends that it has a regulatory interest in Hechavarria's detention pending removal based on his serious criminal history and risk of flight. So the government's continued assertion that Hechavarria must be detained because he is dangerous, simply begs the question and suggests exactly why a hearing is necessary.") (internal citations to record omitted). The process afforded, which consists of totally opaque custody reviews that are not even in compliance with the applicable regulations, is all but certain to promote the erroneous deprivation of Falodun's liberty interest. *See*, *e.g.*, *Hechavarria*, 2018 WL 5776421, at *8 ("[G]iven that the statute precludes any pre- or post-deprivation procedure to challenge the government's assumption that an immigrant is a danger to the community or a flight risk, it presents a significant risk of erroneously depriving Hechavarria of life and liberty interests."). Therefore, the second *Mathews* factor clearly favors Falodun.

### e. Nature of the Process Due

This Court, along with the overwhelming majority of district courts in this Circuit, has determined that the appropriate process due consists of a bond hearing before a neutral decision-maker at

which the burden is on the Government to establish, by clear and convincing evidence, that the detainee should not be released on bond because he or she is a flight risk or danger to the community. *See*, *e.g.*, *Arellano v. Sessions*, No. 6:18-CV-06625-MAT, 2019 WL 3387210, at \*11-\*12 (W.D.N.Y. July 26, 2019) (collecting cases); *Joseph*, 2018 WL 6075067, at \*12-\*13 (collecting cases). In other words, the Government bears the burden of proving that detention of Falodun  continues to serve a legitimate regulatory purpose. When evaluating whether to release Falodun on bond, the decision-maker must consider and address in the bond decision whether there is clear and convincing evidence that no less restrictive alternative to physical detention, including release on bond in an amount Falodun reasonably can afford, with or without conditions, would also reasonably address the Government's regulatory purposes. *Hemans*, 2019 WL 955353, at \*9 (citations omitted).

### C.   Counts One and Two of the Petition

In Counts One and Two of the Petition, Falodun asserts claims based on the Supreme Court's decision in *Zadvydas* interpreting 8 U.S.C. § 1231(a)(6). Having determined to grant relief on Count Three of the Petition, the Court need not reach Falodun's alternative bases for habeas relief. Therefore, the Court does not adjudicate Counts One and Two in this Decision and Order.

## V.   Conclusion

For the foregoing reasons, the Petition is conditionally granted to the extent that within ten (10) days of the date of entry of this Decision and Order, the Government shall bring Falodun before an IJ for an individualized bond hearing. At that hearing, the Government shall bear the burden of proving, by clear and convincing evidence, that he is a flight risk or danger to the community, and that no less restrictive alternatives to physical detention can reasonably address the Government's legitimate interests in detention. If the Government fails to provide Falodun with such a bond hearing within ten (10) calendar days, the Government shall immediately release him. If the Government holds the required bond hearing but fails to carry its burden of proof as stated above, the Government must release Falodun on bond with appropriate conditions. The Government is further ordered to provide a status report to this Court within five (5) calendar days following the completion of the bond hearing, along with a copy of the IJ's bond decision.

The Clerk of Court is directed to close this case.

**SO ORDERED.**

*s/ Michael A. Telesca*

HONORABLE MICHAEL A. TELESCA
United States District Judge

Dated:     December 4, 2019
           Rochester, New York.